STATE OF NORTH CAROLINA v. MARK AUBREY TEMPLE

No. 96

(Filed 6 January 1981)

### 1. Criminal Law § 93— order of proof — no prejudice

The trial court did not err in requiring defendant to present his evidence before the State put on its evidence during a hearing on defendant's motion to suppress, and there was no merit to defendant's contention that the inversion of the order of proof resulted in a shift of the burden of proof, since the order of proof is merely a matter of practice without legal effect; there was nothing in the trial court's order denying defendant's motion to suppress to indicate that the trial judge believed otherwise; and defendant was not prejudiced by the order of proof because it resulted in his having to call one of the State's principal witnesses as his own.

### 2. Criminal Law §§ 75.3, 75.8— indication of wish to remain silent — admissibility of subsequent confession — presenting defendant with evidence of crime — no compulsion

There was no merit to defendant's contention that, by continuing to interrogate him after he indicated that he did not wish to answer any questions, officers violated his constitutional rights, since on each occasion that defendant invoked his right to remain silent the police honored his right by cutting off their interrogation for some period of time; defendant had been informed of his constitutional rights, including his right to remain silent, on six occasions prior to his confession, including one repetition of his rights immediately before he gave his incriminating statement; and defendant understood his rights and affirmatively, voluntarily agreed to waive them. Moreover, there was no merit to defendant's contention that officers coerced his statement by confronting him with evidence recovered from the scene of the crime after he indicated that he did not wish to answer questions, since to present a person in custody with evidence recovered from the scene of the crime is not interrogation; the presentation of evidence in this case did not amount to subtle coercion; officers restated defendant's constitutional rights immediately prior to showing him the evidence; and when defendant refused to make a statement, the officer ceased all questioning or confrontation with evidence, and defendant subsequently invited the officer to resume his questioning.

### 3. Criminal Law § 68— nontestimonial identification order — constitutional rights not violated

The trial court's denial of defendant's motion to suppress nontestimonial identification evidence was without error where, pursuant to an order of the trial court, fingernail scrapings, samples of defendant's head and pubic hair, saliva samples, blood samples, and photographs of any wounds on defendant's body were taken; the order stated defendant's right to counsel; the State stipulated that nothing defendant said during the procedure would be offered into evidence; defendant was fully advised of his constitutional right to the presence of counsel; and the State was not in violation of any provisions under G.S. Ch. 15A, Art. 14 by not procuring an express waiver from defendant, as the statute does not require

an express waiver of the right to have counsel present at a nontestimonial identification procedure.

**4. Criminal Law § 68— bite marks on victim's body — expert testimony that defendant's teeth caused marks**

In a prosecution for first degree murder, the trial court did not err in allowing an expert witness to testify that bite marks appearing on the victim's body were made by defendant's teeth, since the expert witness did not rely on untested methods or unproved hypotheses but applied scientifically established techniques of dentistry and photography to determine whether the bite marks were caused by defendant's teeth.

**5. Homicide § 20.1— photographs of victim in casket — admission as harmless error**

The trial court's error in a first degree murder case in allowing the jury to be shown certain photographs of the victim's body lying in a casket was harmless beyond a reasonable doubt in view of the overwhelming evidence of defendant's guilt.

Justice BROCK did not participate in the consideration or decision of this case.

DEFENDANT appeals from judgement of *Brown, J.*, entered at the 14 January 1980 Criminal Session of Superior Court, PASQUO-TANK County.

Defendant was tried upon an indictment, proper in form, charging him with first degree murder. The jury found defendant guilty of first degree murder and recommended that a sentence of life imprisonment be imposed. From the trial court's judgment sentencing defendant to imprisonment for the term of his natural life, defendant appeals as a matter of right pursuant to G.S. 7A-27(a).

The State's evidence tended to show that at approximately 11:40 p.m. on 6 July 1979 Annette Ruth Jones, age 16, returned to her residence at 108 Persse Street in Elizabeth City, North Carolina. She announced her return to her grandfather and went upstairs to her bedroom. From about 12:15 to 12:45 a.m. on 7 July 1979 she had a telephone conversation with a girlfriend, Wanda Tadlock. There was an exit from Miss Jones' bedroom to the outside, consisting of a stairway on the back side of the house. No one heard Miss Jones leave the house that night at any time after her return at 11:40 p.m.

At approximately 7:30 a.m. on 7 July 1979 Miss Jones' nude body was discovered beside a building at 203 West Church Street in Elizabeth City. Defendant's uncle then lived in an apartment at

that address, and it was he who discovered the body. Dr. Jerry Pickrel, a pathologist, and Dr. Page Hudson, State Medical Examiner, testified that Miss Jones was killed by a blow to the head with a heavy blunt object. A number of small lacerations and several bite marks were found on various parts of her body. There were cuts and abrasions in and about her vagina, but no evidence of sexual intercourse. A blood test revealed that Miss Jones had been drinking, to the extent that a breathalyzer test would have shown a .12 level of alcohol or a mild intoxication. A cement block with blood on it was found in a clump of bushes 87 feet from the body. Several blood-stained sticks were also found in the bushes.

Police officers observed defendant walking on the downtown streets of Elizabeth City at approximately 12:30 a.m. on 7 July 1979. the officers were located on the roof of a building and were keeping the area under surveillance for an unrelated matter. Defendant was last observed at 12:45 to 12:50 a.m. on Main Street, an area a few blocks from Miss Jones' residence.

Defendant was sought for questioning on 10 July 1979. After being informed by his brother that the police were looking for him, defendant voluntarily went to the Elizabeth City Police Department at 2:00 p.m. on that date. He was met outside the station by several officers, one of whom read him his *Miranda* rights, before he was interrogated in any way. When questioned as to his whereabouts on the evening of 6 July and early morning of 7 July, defendant at that time gave a non-incriminating statement. Officers then questioned defendant's brother, who related that defendant had said he thought he remembered killing the victim with a cement block. At 3:30 p.m. defendant was given his *Miranda* warning again, informed of his brother's statement, and asked if he wished to make any further comments. Defendant refused to make a statement. At 3:45 p.m. he was again read his rights and shown several items of evidence taken from the scene of the crime, including the bloodstained cinderblock. At this time defendant agreed to make a statement and confessed that he remembered hitting the girl with a block three or four times and cutting her with a small object. Defendant was then arrested for the murder.

Pursuant to a nontestimonial identification order, defendant was taken to Albemarle Hospital in Elizabeth City at 8:00 p.m. on 10 July 1979, at which time fingernail scrapings, samples of

defendant's head and pubic hair, saliva samples, blood samples, and photographs of any wounds on defendant's body were taken. Defendant was also given a dental examination pursuant to an order on 11 July 1979, during which impressions were made of his teeth. The State presented medical testimony tending to indicate that the bite marks on the victim's body could be identified as having been made by defendant's teeth.

Defendant presented no evidence at trial.

Additional facts relevant to the decision are set forth in the opinion below.

*C. Glenn Austin for defendant.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Roy A. Giles, Jr., for the State.*

COPELAND, Justice.

Defendant argues six assignments of error on appeal. We have carefully considered each assignment and conclude that the trial court committed no error which would entitle defendant to a new trial.

[1] Defendant first contends that the trial court erred in requiring him to present his evidence before the State put on its evidence during the hearing on his motion to suppress. Among the items of evidence that defendant sought to suppress was the confession taken from him at 3:45 p.m. on 10 July 1979. It is the State's burden to prove the voluntariness of a confession. *State v. Williams*, 276 N.C. 703, 174 S.E. 2d 503 (1970), *Rev'd on other grounds*, 403 U.S. 948, 91 S.Ct. 2290, 29 L.Ed. 2d 860 (1971). Defendant argues that by requiring him to present his evidence first, the court erroneously shifted the burden of proving the voluntariness of the confession to defendant. We disagree.

Although the party who has the burden of proof is generally the party who first puts on evidence, the order of presentation at trial is a rule of practice, not of law, and it may be departed from whenever the court, in its discretion, considers it necessary to promote justice. *State v. Britt*, 291 N.C. 528, 231 S.E. 2d 644 (1977); *State v. Jones*, 291 N.C. 681, 231 S.E. 2d 252 (1977); *State v. Knight*, 282 N.C. 220, 192 S.E. 2d 283 (1972); *State v. Thomas*, 244 N.C. 212, 93 S.E. 2d 63 (1956). Since the order of proof in a criminal trial is

largely within the discretion of the trial judge, inversion of the order is not grounds for reversal unless the court abuses its discretion and defendant establishes that he was prejudiced thereby. 75 Am. Jur. 2d *Trials* § 158 (1974). We find that the trial court in this case did not abuse its discretion or commit prejudicial error in requiring defendant to present his evidence first.

Defendant's contention that the inversion of the order of proof results in a shift of the burden of proof is without merit. The order of proof has no effect on the burden of proof or the burden of going forward with the evidence, since the order of proof is merely a matter of practice without legal effect. *State v. Britt, supra; State v. Knight, supra.* Both burdens remained on the State in this case and there is nothing in the trial court's order denying defendant's motion to suppress to indicate that the trial judge believed otherwise. 2 Stansbury's N.C. Evidence § 203 (Brandis Rev. 1973). Defendant's argument that he was prejudiced by the order of proof because it resulted in his having to call the Chief of Police, one of the State's principal witnesses, as his own is also meritless. Defendant complains that this denied him the opportunity to cross-examine the State's witness and placed the State in a position to cross-examine its own witness. We have carefully reviewed the testimony of the Chief of Police at the hearing and find that there is nothing in the record to indicate that the State was allowed to ask any question of this witness that it would not have been in a position to ask if he had been called by the State. Nor is there any indication that defendant was denied permission to ask any question on direct examination that he would have been allowed to ask on cross-examination. The record reveals that defendant was given the opportunity to fully examine the witness and was not prejudiced by calling the witness as his own.

**[2]** By his second assignment of error, defendant alleges that the trial court erred in denying defendant's motion to suppress the statements he made to police officers while he was being interrogated prior to his arrest. Specifically, defendant argues that his statements in the nature of a confession were obtained in violation of his constitutional rights as set forth in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), in that the confession occurred during questioning by police after he had thrice informed them of his wish to exercise his right to remain silent.

After the hearing on defendant's motion to suppress evidence,

the trial judge made the following findings of fact: Between 1:30 and 1:45 p.m. on 10 July 1979 defendant and his brother went to the Elizabeth City Police Department. As defendant approached the station he was met by Officer Frank Kotzian, who informed defendant that he wished to talk with him and advised defendant of his *Miranda* rights. Defendant stated that he understood his rights and was willing to answer questions without the presence of a lawyer. He was then taken to the office of the Chief of Police where, in the presence of Officer W. G. Williams, Jr., Officer Kotzian again advised defendant of his *Miranda* rights and defendant again responded that he understood his rights and would answer questions without an attorney present. Defendant then gave an exculpatory statement concerning his whereabouts on the night of Miss Jones' murder. This interrogation lasted about fifteen minutes.

While defendant was being questioned by Officers Kotzian and Williams, Officer Mervin Raby was talking to defendant's brother, who stated that defendant had admitted to him that he thought he remembered killing Miss Jones. Defendant's brother repeated this statement to the Chief of Police, W. C. Owens. Defendant was brought into Chief Owens' office at 3:27 p.m. and advised of his brother's statement. Chief Owens also read defendant his constitutional rights, after which defendant stated that he did not want to answer any questions. Defendant and his brother were taken to another room and allowed to talk privately. At 3:45 p.m. they returned to the Chief's office, where defendant was once more advised of his *Miranda* rights and he again declared that he did not wish to answer any questions. Defendant was not interrogated further, but Chief Owens proceeded to show defendant certain items of evidence recovered from the scene of the crime, including the cement block used as the murder weapon. At the Chief's request, Officer Williams recounted his observations of defendant on the streets of Elizabeth City on the night of the murder. Defendant was once more advised of his right to remain silent, and defendant indicated that he intended to remain silent at this time. Officer Kotzian then took defendant and his brother to another room. As Officer Kotzian was closing the door, defendant ordered his brother to leave. The brother left and Officer Kotzian again began to close the door in order to leave defendant alone in the room. Before he completed closing the door, defendant started crying and stated, "Why, why!" The officer opened the door and again repeated defendant's constitutional rights. Defendant answered that he

understood his rights and was now willing to make a statement without the presence of an attorney. He told Officer Kotzian that he remembered hitting the victim with a cement block and cutting her with a small object.

Defendant alleges that by continuing to interrogate him after he indicated that he did not wish to answer any questions, the officers violated his constitutional rights as set forth in *Miranda.* The United States Supreme Court stated in that case:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473-74, 86 S.Ct. at 1627-28, 16 L.Ed. 2d at 723.

This language was later interpreted in *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed. 2d 313 (1975), where the Court explained that the passage should not be interpreted literally to mean that once a person has invoked his right to remain silent, he can never again be interrogated by any officer at any time or place. The admissibility of statements obtained after a person states that he wishes to remain silent depends upon whether his "right to cut off questioning" was "scrupulously honored." 423 U.S. at 104, 96 S.Ct. at 326, 46 L.Ed. 2d at 321. This Court, relying on *Miranda* and *Mosley,* held in another Pasquotank County case, *State v. Riddick,* 291 N.C. 399, 411, 230 S.E. 2d 506, 514, (1976):

> "... The Miranda rule that in custody interrogation of a defendant must cease when the defendant indicates he wishes to remain silent or wishes to consult counsel, or both, does not bar a subsequent statement by a defendant who, after having been fully advised of his constitutional rights, freely and voluntarily waives his right to remain silent and his right to counsel and invites the officer to

resume talks with him."

*See also State v. Hill,* 294 N.C. 320, 240 S.E. 2d 794 (1978).

We hold that the evidence before the trial court was sufficient to support its conclusion that defendant's confession was obtained without violation of his constitutional rights. On each occasion that defendant invoked his right to remain silent, the police honored his right by cutting off their interrogation for some period of time, as required by the holding in *Mosley.* Defendant had been informed of his constitutional rights, including his right to remain silent, on six occasions prior to his confession, including one repetition of his rights immediately before he gave his incriminating statement. The evidence supports the trial court's finding that defendant understood his rights and affirmatively, voluntarily agreed to waive them. Since the trial court's finding is supported by substantial evidence, it is binding upon this Court on appeal. *State v. Saults,* 299 N.C. 319, 261 S.E. 2d 839 (1980); *State v. Hill, supra.* Defendant's contention that the officers coerced his statement by confronting him with evidence recovered from the scene of the crime, after he indicated that he did not wish to answer questions, is without merit. This Court has held that to present a person in custody with evidence recovered from the scene of the crime is not "interrogation" within the meaning of the *Miranda* decision. *State v. McLean,* 294 N.C. 623, 242 S.E. 2d 814 (1978). Nor was the presentation of evidence in this case the type of "subtle coercion" prohibited under the holding in *Miranda.* The mere fact that a confession is made after a defendant is confronted with circumstances normally calling for an explanation is insufficient to render the confession incompetent. *State v. Mitchell,* 265 N.C. 584, 144 S.E. 2d 646 (1965), *cert. denied,* 384 U.S. 1024, 86 S.Ct. 1972, 16 L.Ed. 2d 1029 (1966). The officers restated defendant's constitutional rights immediately prior to showing him the evidence. When defendant refused to make a statement, the officers ceased all questioning or confrontation with evidence and led defendant to another room where he could talk privately with his brother. When defendant said "why, why!" before the officer closed the door to this other room, he invited the officer to resume his questioning. We find that defendant freely and voluntarily waived his right to remain silent and his right to the presence of counsel. Defendant's second assignment of error is overruled.

[3]    Defendant next alleges that the trial court erred in denying his

motion for suppression of the evidence obtained as a result of the nontestimonial identification order, because the record fails to show that he waived his right to have counsel present during the nontestimonial identification procedure.

Defendant concedes that Article 14 of Chapter 15A of the General Statutes, which sets forth the procedures to be followed in obtaining nontestimonial identification, does not apply to an accused person such as defendant who has been held in custody. *State v. Reynolds*, 298 N.C. 380, 259 S.E. 2d 843 (1979); *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). Nevertheless, defendant contends that the provisions of that article are applicable in this case because by having a nontestimonial identification order issued, the State elected to proceed under the procedures set forth in that article, and it should be bound by this election. Defendant maintains that these statutory provisions were violated when nontestimonial identification was obtained without the presence of counsel representing the defendant or an express waiver by defendant of his right to have counsel present.

Assuming *arguendo* that Article 14, Chapter 15A is applicable in the case *sub judice*, we hold that the State fully complied with the procedures set forth therein. G.S. 15A-278 provides that a nontestimonial identification order must state: "(5) That the person is entitled to be represented by counsel at the procedure, and to the appointment of counsel if he cannot afford to retain one . . . ." The order in this case did state these rights. G.S. 15A-279(d) further provides:

"Any such person is entitled to have counsel present and must be advised prior to being subjected to any nontestimonial identification procedures of his right to have counsel present during any nontestimonial identification procedure and to the appointment of counsel if he cannot afford to retain counsel. No statement made during nontestimonial identification procedures by the subject of the procedures shall be admissible in any criminal proceeding against him, unless his counsel was present at the time the statement was made."

The State here stipulated that nothing defendant said during the procedure would be offered into evidence. The record reveals that defendant was fully advised of his constitutional right to the pres-

ence of counsel. In addition to the statement of his rights appearing in the nontestimonial identification order, defendant had been verbally informed of his rights six times prior to being taken to the hospital. Article 14 does not require an express waiver of the right to have counsel present at the nontestimonial identification procedure, therefore the State was not in violation of any provision thereunder by not procuring an express waiver from defendant. The trial court's denial of defendant's motion to suppress nontestimonial identification evidence was without error.

[4] By his fourth assignment of error defendant contends that the trial court erred in allowing expert witnesses to testify that bite marks appearing on the victim's body were made by defendant's teeth. The State called as an expert witness Dr. William P. Webster, a dentist employed by the University of North Carolina School of Dentisty and a consultant to the Chief Medical Examiner in Chapel Hill, North Carolina in matters concerning forensic odontology. Dr. Webster testified that based on his experience of examining the teeth of thousands of individuals for over twenty years, he believed that each individual has an unique and distinctive dentition. After examining defendant's teeth, making impressions of his upper and lower teeth, and preparing plaster casts and overlays from the impressions, Dr. Webster stated that defendant's dentition was unusual and distinctive in that there was a malalignment causing the front teeth, or central incisors, to point backwards toward the back of the head, and causing the lateral incisors to point outward. He further testified that he matched the overlays of defendant's teeth with the bite mark on the left upper chest area of Miss Jones' body and found eight points of identification between the overlays and the bite mark. Based on this evidence, Dr. Webster stated that in his opinion the bite mark on Miss Jones' chest was made from the dentition of defendant. The State also called Dr. Page Hudson, a forensic pathologist and Chief Medical Examiner for the State of North Carolina, as an expert witness. Dr. Hudson testified that he had called in Dr. Webster, an expert in forensic odontology, to perform the comparative examination of defendant's dentition and the bite marks on the victim's skin. After observing Dr. Webster's work, Dr. Hudson stated that in his opinion the bite marks on the victim's skin were caused by defendant's teeth.

Defendant maintains that Dr. Webster's testimony should have been excluded because it was based on the results of a test

State v. Temple

which was not scientifically proven for reliability. He argues that Dr. Webster's opinion was formed from unproven hypotheses and mathematical probability. Defendant further alleges that Dr. Hudson should not have been allowed to express an opinion identifying the bite marks as being made by defendant's teeth because he was not qualified as an expert in forensic odontology.

The question of the admissibility of evidence tending to identify an accused by his own bite marks is an issue of first impression in this jurisdiction. Although there is little authority on the subject from other jurisdictions, those courts which have dealt with the question have all permitted such identification testimony. *See Annot.*, 77 A.L.R. 3d 1122 (1977).

The leading case on identification through bite mark analysis is *People v. Marx*, 54 Cal. App. 3d 100, 126 Cal. Rptr. 350 (1975). The victim in *Marx* had been killed by manual strangulation, but had also sustained a bite wound on her nose. The body of the victim was exhumed fifty-one days after death and a cast of the wound on the nose was made. Three dentists were allowed to testify that after comparing impressions taken of defendant's teeth and the cast of the victim's nose, they believed that the bite mark was made by defendant's teeth. It appeared that the State supplemented the expert's testimony by showing models, photographs, x-rays, and slides of the victim's wound and defendant's teeth. In affirming the trial court's decision to admit the expert testimony into evidence, the California court reasoned as follows:

> ". . . [T]he basic data on which the experts based their conclusions were verifiable by the court. Further, in making their painstaking comparisons and reaching their conclusions, the experts did not rely on untested methods, unproved hypotheses, intuition or revelation. Rather, they applied scientifically and professionally established techniques — x-rays, models, microscopy, photography — to the solution of a particular problem which, though novel, was well within the capability of those techniques. In short, in admitting the evidence, the court did not have to sacrifice its independence and common sense in evaluating it." 54 Cal. App. 3d at 111, 126 Cal. Rptr. at 356.

In like manner, we hold that the trial court properly admitted

the testimony of Drs. Webster and Hudson which tended to identify the bite marks on Miss Jones' skin as being made by defendant's teeth. The general rule in North Carolina regarding the admissibility of new methods and types of scientific evidence was stated by the Court in *State v. Powell*, 264 N.C. 73, 74, 140 S.E. 2d 705, 706 (1965), *quoting from Toms v. State*, 95 Okla. Crim. 60, 69, 239 P. 2d 812, 821 (1952):

> "This court is of the opinion, that we should favor the adoption of scientific methods of crime detection, where the demonstrated accuracy and reliability has become established and recognized. Justice is truth in action, and any instrumentality, which aids justice in the ascertainment of truth, should be embraced without delay."

Contrary to defendant's allegations, the expert witnesses in this case did not rely on untested methods or unproved hypotheses. They applied scientifically established techniques of dentistry and photography to the solution of a particular novel problem. The method of bite mark identification employed in this case is simply a matter of comparing items of physical evidence. Although the method of comparison requires the services of skilled experts, the experts used models and measurements procured by standardized procedures. *Niehaus v. State*, 265 Ind. 655, 359 N.E. 2d 513 (1977). Photographs of the wound and models used by the experts in reaching their conclusion were presented at trial as evidence and were verifiable by the court. We reject defendant's argument that the comparison technique in this case is inherently unreliable because it was based in part upon Dr. Webster's studies of the mathematical probability that each person has a unique dentition. Dr. Webster's statement that after examining the teeth of thousands of persons over a twenty year period he believed that each individual had a unique dentition was simply an attempt to explain his scientific method in response to defendant's question whether any other person could possibly have made the same marks on the victim's skin. Dr. Webster expressly stated that he had never undertaken any mathematical studies in this area. *See People v. Slone*, 76 Cal. App. 3d 611, 143 Cal. Rptr. 61 (1978).

We also reject defendant's contention that Dr. Hudson's testimony regarding the bite marks should have been excluded because he was not qualified as an expert in the field of forensic

odontology. Dr. Hudson called in Dr. Webster as an expert in forensic odontology and the two worked together in seeking to determine whether defendant's teeth made the bite mark on the body. Dr. Hudson's testimony was proper as the opinion of the Chief Medical Examiner of the State, arrived at after consulting with an expert whose aid he had requested. In any event, considering the extensive bite mark identification testimony given by Dr. Webster, Dr. Hudson's statement of his opinion was not prejudicial to defendant.

We therefore find that the expert testimony in this case was based upon established scientific methods, and is admissible as an instrumentality which aids justice in the ascertainment of the truth. Any objection to this testimony goes to the credibility to be attributed to the evidence, not to its admissibility. *Patterson v. State*, 509 S.W. 2d 857 (Texas Crim. App. 1974). Defendant's fourth assignment of error is overruled.

**[5]**   Defendant next maintains that the trial court erred in allowing the jury to be shown certain photographs of the exhumed body of Miss Jones. These photographs were presented to the jury by means of color slides projected on a screen and were introduced to illustrate the testimony of Drs. Hudson and Webster. Defendant specifically complains that the photographs of the victim's body lying in her casket were without probative value, serving only to arouse the prejudices of the jury.

Defendant concedes that photographs are admissible in this jurisdiction to illustrate the testimony of a witness, and the fact that the photograph may depict a gory, gruesome scene or tend to arouse prejudice in the jury does not render it incompetent if it is otherwise relevant and material. *State v. Horton*, 299 N.C. 690, 263 S.E. 2d 745 (1980); *State v. Matthews*, 299 N.C. 284, 261 S.E. 2d 872 (1980); *State v. Young*, 291 N.C. 562, 231 S.E. 2d 577 (1977); 1 Stansbury's N.C. Evidence § 34 (Brandis Rev. 1973). However, defendant contends that the State's use of photographs in this case falls within the rule set forth in *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889 (1963), and restated as follows in *State v. Mercer*, 275 N.C. 108, 120, 165 S.E. 2d 328, 337 (1969):

> ". . . the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional

photographs add nothing in the way of probative value but tend solely to inflame the jurors."

We find that many of the photographs presented by the State were relevant as illustrations of Dr. Hudson's and Dr. Webster's testimony. However, several of the photographs, particularly those taken of the body lying in the casket, add nothing to the State's case and would have been better left unpresented. Nevertheless, in view of the overwhelming evidence of defendant's guilt, we hold that the photographs were harmless error beyond a reasonable doubt, and therefore defendant's assignment of error is overruled.

Since we have held that the trial judge committed no prejudicial error in this case, we also reject defendant's argument that the trial court erred in denying defendant's motion for a mistrial.

This was a very gruesome murder, for which the State established no motive. The reason for the killing will remain shrouded in mystery, as was the reason for the untimely death of Nell Cropsey in a case from the same county near the turn of the century. *State v. Wilcox*, 132 N.C. 1120, 44 S.E. 625 (1903).

Defendant received a fair trial free from prejudicial error and we find

No error.

Justice BROCK did not participate in the consideration or decision of this case.