STATE OF NORTH CAROLINA v. FREDDIE LAWRENCE McDOWELL, JR.

No. COA10-1553

(Filed 6 September 2011)

**1. Criminal Law—diminished capacity—instruction—evidence not sufficient**

A first-degree murder defendant was not entitled to a diminished capacity instruction based on testimony by defendant's experts. The crucial inquiry was not the extent to which defendant offered evidence of mental impairment, but whether there was evidence tending to show the effect of his condition upon his ability to premeditate, deliberate, and form a specific intent to kill.

**2. Evidence—observation of hair on wall—no special expertise required—evidence collection not required**

The trial court did not err in a first-degree murder prosecution by allowing law enforcement officers to testify that they observed a hair and attached tissue on the wall of the murder scene. No particular expertise is required for a witness to testify that he saw a hair and officers were not required to collect evidence as a condition to testimony about a subject.

**3. Evidence—expert testimony—based on photograph**

The trial court did not err in a first-degree murder prosecution by not admitting challenged testimony from a firearms expert who used a photograph in developing his opinions. No authority was cited or found holding that evidence sufficient to form the basis of an expert opinion becomes insufficient if it takes the form of a photograph.

Appeal by defendant from judgment entered 14 November 2008 by Judge Edgar B. Gregory in Ashe County Superior Court. Heard in the Court of Appeals 12 May 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General Jill Ledford Cheek, for the State.*

*Marilyn G. Ozer for Defendant-appellant.*

ERVIN, Judge.

Defendant Freddie Lawrence McDowell, Jr., appeals from a judgment sentencing him to life imprisonment without the possibility of

STATE v. McDOWELL

[215 N.C. App. 184 (2011)]

parole in the custody of the North Carolina Department of Correction based upon his conviction for first degree murder. On appeal, Defendant contends that the trial court erred by refusing to instruct the jury concerning the issue of diminished capacity, admitting testimony concerning a hair allegedly observed by law enforcement officers in the cabin in which the alleged murder occurred, and allowing an agent of the State Bureau of Investigation to testify concerning an opinion that he developed based upon his examination of a photograph depicting certain bullet holes. After careful consideration of Defendant's challenges to the trial court's judgment in light of the record and the applicable law, we conclude that Defendant had a fair trial that was free from prejudicial error and is not entitled to relief from the trial court's judgments on appeal.

## I. Factual Background

### A. Substantive Facts

#### 1. The Shooting

In June 2006, Defendant was twenty-one years old and lived in Raleigh with Paul and Connie Stocks. The Stocks were the parents of Ashley Stocks, who was Defendant's girlfriend at that time. The Stocks had a mountain cabin located on Phillips Gap Road in Wilkes County.

On Thursday, 22 June 2006, Defendant drove to the Stocks' mountain cabin with Drew Howell, who had been one of Defendant's good friends for a number of years. Defendant and Mr. Howell brought several firearms with them, including two rifles, a shotgun, and a .38 special Charter Arms revolver. The two men intended to stay at the Stocks' cabin for about a week while drinking, watching movies, playing video games, and engaging in target practice. Although Paul Stocks visited the cabin over the weekend, he returned to Raleigh on Sunday night.

Ashley Stocks and Cassie Burgos were supposed to join Defendant and Mr. Howell on the weekend of 30 June 2006. At around 11:30 p.m. on 29 June 2006, Ms. Burgos called the cabin and asked to speak with Mr. Howell. At the time that he answered the phone, Defendant told Ms. Burgos that Mr. Howell was sleeping, that Mr. Howell was homesick, and that Defendant planned to drive Mr. Howell home in a few hours for that reason. Although Ms. Burgos left a message on Mr. Howell's cell phone, she did not receive a return call from him.

According to available telephone records, Defendant made nineteen calls from the Stocks cabin, including repeated calls to his father

and Mr. Stocks in which he stated that he had shot Mr. Howell, beginning at about 10:30 p.m. on 29 June 2006 and continuing into the early morning hours of 30 June 2006. Mr. McDowell did not indicate during these calls precisely when he had shot Mr. Howell. None of the calls placed from the Stocks' cabin were made to 911 for the purpose of obtaining emergency assistance.

At around 3:00 a.m. on 30 June 2006, the Stocks arrived at the Wilkes County Sheriff's Office, where they spoke with Deputy Christopher Key. Shortly thereafter, Deputies Harper Hartley and Gene Wyatt arrived. The officers had Mr. Stocks make a recorded phone call to Defendant. After listening to the conversation between Defendant and Mr. Stocks, the group drove to the Stocks' cabin. The officers parked at the top of the driveway leading to the cabin, while Mr. Stocks drove to the residence and returned with Defendant. At that point, Defendant was placed under arrest for the shooting of Mr. Howell.

At the time of his arrest, Defendant smelled of alcohol. Defendant told the officers that he had taken some pills and said, "I guess you want to know where the body is." After making this comment, Defendant led the officers down a trail to a wooded area located about 80 feet from the back deck of the cabin, where they discovered Mr. Howell's body partly hidden by leaves. The officers observed smear or drag marks on the deck steps and reddish stains in the grass that led toward the body. At about 5:00 or 6:00 a.m., when the body was discovered, Mr. Howell was stiff and cold to the touch.

In addition to providing them with information concerning the location of Mr. Howell's body, Defendant told the officers where to find a .38 caliber revolver with which he had shot Mr. Howell and which he had hidden under a grill cover on the deck. The gun, which holds five bullets, was fully loaded at the time the officers retrieved it. After the location of Mr. Howell's body and the discovery of the gun, the officers determined that no one else was in the house, at which point Deputy Wyatt accompanied Defendant to Wilkes Regional Medical Center. At the hospital, Defendant told Detective Alex Nelson of the Wilkes County Sheriff's Department that he had shot Mr. Howell in self-defense.

Dr. Ellen Riemer, a forensic pathologist, conducted an autopsy on Mr. Howell's body. Mr. Howell had a .20 blood alcohol level. Dr. Riemer determined that Mr. Howell died as the result of multiple gunshot wounds. Dr. Riemer identified forty-five gunshot wounds to Mr. Howell's body, including a sufficient number of entrance and exit

wounds in Mr. Howell's head that his entire brain was destroyed. Dr. Riemer counted twenty-seven gunshot wounds in Mr. Howell's chest, abdomen, and pelvic area and another fourteen such wounds in Mr. Howell's neck and head. Finally, Dr. Riemer detected a cluster of post-mortem gunshot wounds to Mr. Howell's genital area and multiple bullet wounds to his face, including wounds to his eyes and lips. Dr. Riemer determined that thirty-two of the wounds which Mr. Howell sustained were inflicted while he was alive, while the remaining thirteen wounds were inflicted after his death. None of the wounds to Mr. Howell's body had been inflicted at close range. An analysis of fly larvae found on Mr. Howell's body indicated that he had been dead for at least twelve hours at the time that investigating officers found his body.

After observing the interior of the cabin, Detective Steve Cabe of the Wilkes County Sheriff's Department asked the State Bureau of Investigation for assistance in processing the scene and collecting evidence. In the course of that process, investigating officers collected spent casings and live projectiles from many different locations in the house. Shotgun shells, .38 caliber cartridges, and other firearms and ammunition were discovered in the cabin, deck, and yard. A projectile was recovered from the fireplace in the living room and a bullet hole was observed above the kitchen sink. A total of approximately 72 shell casings were discovered in the kitchen, dining, and living area, with .38 caliber shell casings having been found in the kitchen and dining area. Several bullet holes were identified in the north wall of the living room. The investigating officers used trajectory rods to locate the bullets that were probably responsible for making these holes and discovered them in the bedroom behind the living room wall.

A blood spray pattern appeared on the refrigerator door. In addition, blood appeared on a leg of the dining room table. Stains containing blood with DNA matching that of Mr. Howell and inconsistent with that of Defendant were identified inside the house, on the deck, and in the yard, all of which were consistent with someone having dragged something from the cabin to the location at which Mr. Howell's body was discovered. A bloody footwear impression was found on the kitchen floor; although forensic testing eliminated Mr. Howell's shoes as a possible source for this impression, that testing did not eliminate the possibility that Defendant made the footprint.

Although the kitchen floor initially looked clean, the laminate floor in that room appeared to be chipped. A more intensive examination revealed that there had "been a massive clean-up" of the kitchen. After using phenolphthalein and a dye called amido black,

investigating officers determined that there had been blood on the kitchen floor. In addition, investigating officers found paper towels that tested positive for blood inside a trash bag. An examination of the damaged kitchen floor area using amido black established that blood had seeped beneath the surface of the floor and into the subfloor. After using a saw to remove an area of laminate from the kitchen floor, investigating officers found bullet holes in the padding and subfloor and retrieved eight to ten bullets from the kitchen subfloor near the refrigerator. In addition, investigating officers found blood stains near the bullet holes on the kitchen floor; the blood stain pattern detected at that location was consistent with both an effort to clean the premises and with the dragging of Mr. Howell's body from the cabin. A subsequent DNA analysis revealed that the blood found at this location belonged to Mr. Howell.

The three bullets found in the bedroom, sixteen of the eighteen bullets taken from Mr. Howell's body, and various bullets recovered from beneath the kitchen floor had all been fired from the .38 caliber revolver that Defendant had hidden under the grill cover. There were thirty-three bullet holes in the front of Mr. Howell's shirt and twenty-eight holes in the back of that garment. In order to shoot Mr. Howell forty-five times with the .38 revolver, Defendant would have had to stop shooting and reload the weapon eight or nine times. Special Agent Shane Dale Greene of the State Bureau of Investigation, an expert in ballistics, testified that firing the .38 revolver 45 times would have generated a lot of smoke. A smoke detector that had been removed from the ceiling was found on the floor.

## 2. Self Defense Evidence

At trial, Defendant testified that he and Mr. Howell got along well during the first part of their visit to the Stocks' cabin. On Wednesday, however, Mr. Howell became "ill." Among other things, Mr. Howell refused to assist in cleaning the cabin. Although Mr. Howell continued to be "arrogant and ill" on Thursday, Defendant "blew it off" and went shopping for a broom since he could not find one in the cabin. At that point, debris, shotgun shells, shell casings, beer cans and dishes were strewn throughout the house. Defendant did not want the Stocks to see their cabin in that condition. After Defendant failed to return with the beer that Mr. Howell had requested, Mr. Howell became angry and demanded that Defendant cook something. As a result, Defendant cooked a pizza, and the two men began drinking a bottle of wine.

STATE v. McDOWELL

[215 N.C. App. 184 (2011)]

After drinking wine, Defendant became intoxicated and lay down on the couch in order to take a nap. On the other hand, Mr. Howell went outside to do some shooting. At some point, Mr. Howell came back inside with a "real ill" look on his face. When Defendant asked Mr. Howell what was wrong, Mr. Howell stated that the treatment that Defendant had received from the Stocks was not fair, that Defendant got better treatment than he deserved, and that, if he could, he would keep the Stocks from treating Defendant so well. After the two of them went out on the deck, Mr. Howell punched Defendant, jumped on top of him, and hit and cursed at Defendant while Defendant begged Mr. Howell to stop. After Mr. Howell stopped hitting him, Defendant went back inside, resumed his position on the couch again, and fell asleep. Upon awaking and hearing Mr. Howell shooting a gun, Defendant asked him to stop shooting because the Stocks did not want them to shoot at night. In response, Mr. Howell cursed at Defendant.

Although Defendant went back to sleep, he was awakened when Mr. Howell said "Get up. I'm going to kill you." When he sat up, Defendant saw Mr. Howell in the kitchen pointing the shotgun at his head. At that point, Defendant panicked and grabbed the .38 revolver. When Mr. Howell looked down, Defendant shot him for fear that he was going to die. At that point, the shotgun was in Mr. Howell's hand; however, after Defendant shot Mr. Howell, the shotgun dropped to the floor. Although Mr. Howell fell back against the refrigerator, he tried to grab the shotgun again, so Defendant "picked the pistol up and shot him some more." Defendant testified that he recalled shooting a few times; after that, Defendant recalled only a "succession" of shots. Defendant did not remember reloading the gun, dragging Mr. Howell down the steps and into the woods, or cleaning up all the blood before the police arrived. In addition, Defendant did not know how the shotgun got onto the bed in the bedroom, where it was discovered by investigating officers. Defendant's next vivid memory was of waking up in the hospital.

Dave Cloutier, an expert in use-of-force science and self-defense tactics, testified that, given Defendant's account of the events that occurred at the time of the shooting, Defendant's initial decision to use force against Mr. Howell was reasonable given the "pre-attack cues" that Defendant had received and applicable "use-of-force variables." The factors that Mr. Cloutier deemed relevant included Mr. Howell's decision to point a shotgun at Defendant, the fact that Mr. Howell threatened to kill Defendant, the fact that Defendant feared for his life, and the fact that Defendant needed to react quickly.

### 3. Defendant's Mental Status

#### a. Defendant's Evidence

Dr. George Patrick Corvin, M.D., a forensic psychiatrist, reviewed materials provided to him by Defendant's trial counsel, gathered information concerning Defendant's psychosocial history, and met with Defendant. Dr. Corvin learned that Defendant had been admitted to Brynn Marr Hospital for alcohol detoxification on 11 June 2006, some two and a half weeks prior to the shooting, and had been discharged on 14 June 2006 with a diagnosis of post-traumatic stress disorder, alcohol dependence, personality disorder, and a history of head trauma. At the time of his discharge, Defendant was placed on a number of medications, including an antidepressant, a mood stabilizer and a compound intended to treat his alcohol dependence.

Defendant told Dr. Corvin that he and his mother did not get along; that his mother was violent and unpredictably abusive to him; that she frequently beat him with little or no provocation on his part; and that she had kicked him out of the house when he was sixteen or seventeen. Defendant's parents fought constantly. Defendant's father, an alcoholic, screamed at Defendant and made derogatory comments about him. Defendant reported a history of alcohol dependence and medically-observed alcohol withdrawal symptoms during his conversations with Dr. Corvin. Among other things, Defendant was expelled from school while he was in the eleventh grade for using alcohol. Defendant had never remained employed for an extended period of time and was unemployed at the time of the shooting. Finally, Defendant reported a history of cocaine addiction and acknowledged having used other drugs.

According to Dr. Corvin, post-traumatic stress disorder is an anxiety-related condition resulting from exposure to one or more serious dangers or traumatic situations during the course of a person's life. Individuals suffering from post-traumatic stress disorder are prone to brief dissociative episodes. In addition, Defendant also had a history of head trauma. In February 2002, Defendant had been seriously injured, with documented signs of a concussion, when he was hit on the head with a metal plate or hubcap. Defendant received treatment for numerous facial fractures at the University of North Carolina Hospitals. A subsequent CT scan, an MRI examination, and an EEG produced normal results. Dr. Corvin testified that a person who had sustained a head injury was more prone to alcohol-related blackouts and that Defendant had a history of alcohol-related losses of consciousness.

STATE v. McDOWELL

[215 N.C. App. 184 (2011)]

The report that Defendant provided to Dr. Corvin concerning the events surrounding the shooting of Mr. Howell generally corroborated his trial testimony. Defendant told Dr. Corvin that he had shot Mr. Howell while acting in self-defense and that, after initially shooting Mr. Howell, he vaguely recalled firing several more shots at Mr. Howell from the area of the couch. However, Defendant claimed to have no clear recall of what had happened until he woke up at the hospital following his arrest. In Dr. Corvin's opinion, at the time that he shot Mr. Howell, Defendant was suffering from post-traumatic stress disorder stemming from his childhood history of abuse and two other assaults that he believed to have been life-threatening; poly-substance abuse; and personality change stemming from his head injury. When asked how Defendant's post-traumatic stress disorder might have affected his behavior at the time of the shooting, Dr. Corvin testified that a person suffering from post-traumatic stress disorder tends to be hyper-vigilant and that a person, such as Defendant, who suffered from post-traumatic stress disorder would have had an exaggerated response to a threat, such as Mr. Howell's decision to point a gun at Defendant. In addition, Dr. Corvin believed that Defendant's head injury made him impulsive and irritable and resulted in frontal lobe disinhibition, further affecting Defendant's ability to control his behavior. Ultimately, Dr. Corvin was of the opinion that Defendant initially acted in self-defense before blacking out and dissociating.

Dr. Claudia Coleman, a forensic psychiatrist, interviewed Defendant and conducted a records review. Defendant provided Dr. Coleman with substantially the same history that he had given Dr. Corvin. Dr. Coleman opined that defendant did not cope with stress well; that Defendant is immature, impulsive, and passive-aggressive; and that Defendant suffers from anxiety and fears that have their origin in low self-esteem. The testing that Dr. Coleman performed indicated that Defendant had exhibited symptoms of post-traumatic stress disorder and dependent, avoidant, and borderline personality features. Defendant's mild cognitive impairment resulted in memory problems and difficulties in processing information. A significant feature of the cognitive impairment that Dr. Coleman noted is that Defendant's brain is susceptible to other insults, including the impact of alcohol and drug use, making him less likely to be good at problem-solving or at thinking things through. The symptoms of post-traumatic stress disorder that Defendant exhibited resulted from his having been abused as a child and from head trauma. Dr. Coleman believed that Defendant was suffering from a mild cognitive disorder

exacerbated by drug or alcohol use, depression, and post-traumatic stress disorder on 29 June 2006. According to Dr. Coleman, Defendant's fear of Mr. Howell was consistent with his anxiety disorder and with his symptoms of post-traumatic stress disorder. In response to a question inquiring if Defendant was able to carry out a plan at the time that he killed Mr. Howell, Dr. Coleman responded, "[a] very disorganized, unrealistic kind of ridiculous plan but illogical, yeah."

### b. State's Rebuttal Evidence

Mark Hazelrigg, a forensic psychologist and director of outpatient forensic evaluation services at Dorothea Dix Hospital, evaluated Defendant pursuant to court order. As part of that process, Dr. Hazelrigg reviewed the reports provided by Drs. Coleman and Corvin and observed Defendant. According to Dr. Hazelrigg, Defendant had a history of and exhibited traits consistent with a diagnosis of antisocial personality features; however, Dr. Hazelrigg concluded that Defendant did not meet all the criteria required for the making of such a diagnosis. Antisocial personality disorder is characterized by abusing the rights of others, breaking the law, lying, cheating, and taking action without regard to the effect of one's conduct on other people. In addition, Defendant exhibited features of borderline personality disorder. The manner in which Defendant portrayed his mental condition in his conversations with Dr. Hazelrigg was inconsistent with Dr. Hazelrigg's personal observations. Dr. Hazelrigg believed that, at the time of the shooting, while Defendant was feeling the effects of alcohol, he was not overly intoxicated; that Defendant did not suffer from any disorder or condition that would have prevented him from forming a specific intent to kill; and that Defendant was capable of forming a specific intent to kill.

Robert Stanley Brown, Jr., M.D., reviewed records and mental health reports prepared by other experts and met with Defendant. Dr. Brown did not detect anything in the course of his work that would lead him to believe that Defendant lacked the capacity to form the specific intent to kill at the time of the shooting. Dr. Brown diagnosed Defendant as suffering from alcohol dependency and antisocial personality disorder. Although Dr. Brown did not believe that Defendant suffered from post-traumatic stress disorder, he opined that any post-traumatic stress disorder from which Defendant might have suffered would not have impaired his ability to think, formulate ideas and plans, or function. Finally, Dr. Brown concluded that the combination of alcohol consumption, antisocial personality disorder, and the

STATE v. McDOWELL

[215 N.C. App. 184 (2011)]

effects of an earlier head injury would not have prevented the Defendant from being able to form the specific intent to kill.

### B. Procedural History

On 30 June 2006, a warrant charging Defendant with the first degree murder of Mr. Howell was issued. On 11 September 2006, the Wilkes County grand jury returned a bill of indictment charging Defendant with first degree murder. On 11 May 2007, Defendant filed a notice indicating that he intended to assert the defenses of voluntary intoxication, self-defense, and diminished capacity. On 23 July 2007, the State moved that Defendant be committed to Dorothea Dix hospital for an evaluation concerning the validity of these defenses.

The charge against Defendant came on for trial before Judge Henry E. Frye, Jr., at the 26 February 2008 criminal session of the Wilkes County Superior Court. However, the trial ended prior to the completion of jury selection because of the prolonged illness of one of the prosecutors.

The charge against Defendant came on for trial a second time before Judge Edgar B. Gregory and a jury at the 28 July 2008 criminal session of the Wilkes County Superior Court. After the completion of jury selection, the participants learned that a courthouse employee had spoken to one of the jurors, causing the trial court to declare a mistrial. On 19 August 2008, the trial court granted Defendant's request for a change of venue and transferred the case to the Ashe County Superior Court.

The charge against Defendant came on for trial a third time before the trial court and a jury at the 27 October 2008 session of the Ashe County Superior Court. On 13 November 2008, the jury returned a verdict convicting Defendant of first degree murder on the basis of malice, premeditation, and deliberation. As a result, the trial court sentenced Defendant to life imprisonment without the possibility of parole in the custody of the North Carolina Department of Correction. Defendant noted an appeal to this Court from the trial court's judgment.

### II. Legal Analysis

### A. Diminished Capacity

**[1]** On appeal, Defendant argues that he "is entitled to a new trial because the trial court erroneously denied his request for a jury instruction on diminished capacity." According to Defendant, he was

entitled to the delivery of a diminished capacity instruction based on the existence of record evidence tending to show that, at the time of the shooting, he suffered from various conditions, including post-traumatic stress syndrome, alcohol dependence, and cognitive impairment resulting from a head injury, that were sufficient to support a finding that Defendant might overreact to stress or conclude that deadly force was necessary to deal with a threatening situation. A careful examination of the record shows, however, that there was no evidence tending to cast any doubt on Defendant's ability to premeditate, deliberate, or form the specific intent to kill necessary for guilt of first degree murder on the basis of malice, premeditation, and deliberation. As a result, the trial court did not err by denying Defendant's request for a diminished capacity instruction.

" 'When determining whether the evidence is sufficient to entitle a defendant to jury instructions on a defense or mitigating factor, courts must consider the evidence in the light most favorable to defendant.' " *State v. Oliver*, 334 N.C. 513, 520, 434 S.E.2d 202, 205 (1993) (quoting *State v. Mash*, 323 N.C. 339, 348, 372 S.E.2d 532, 537 (1988)). " 'A trial court must give a requested instruction that is a correct statement of the law and is supported by the evidence.' . . . Where the defendant's requested instruction is not supported by the evidence, the trial court may properly refuse to give it." *State v. Wright*, ___ N.C. App ___, ___, 709 S.E.2d 471, 473 (2011) (quoting *State v. Conner*, 345 N.C. 319, 328, 480 S.E.2d 626, 629, *cert. denied*, 522 U.S. 876, 118 S. Ct. 196, 139 L. Ed. 2d 134 (1997), and citing *State v. Rose*, 323 N.C. 455, 459, 373 S.E.2d 426, 429 (1988)).

"The elements of first-degree murder are: (1) the unlawful killing, (2) of another human being, (3) with malice, and (4) with premeditation and deliberation." *State v. Coble*, 351 N.C. 448, 449, 527 S.E.2d 45, 46 (2000) (citing N.C. Gen. Stat. § 14-17 (other citations omitted). "First degree murder, which has as an essential element the intention to kill, has been called a specific intent crime." *State v. Jones*, 339 N.C. 114, 148, 451 S.E.2d 826, 844 (1994), *cert. denied*, 515 U.S. 1169, 115 S. Ct. 2634, 132 L. Ed. 2d 873 (1995). As a result:

"[A] specific intent to kill is a necessary ingredient of premeditation and deliberation. It follows, necessarily, that a defendant who does not have the mental capacity to form an intent to kill, or to premeditate and deliberate upon the killing, cannot be lawfully convicted of murder in the first degree [on the basis of premeditation and deliberation]."

*State v. Phillips,* ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2011 N.C. LEXIS 385, *36) (quoting *State v. Cooper,* 286 N.C. 549, 572, 213 S.E.2d 305, 320 (1975) (internal citations omitted), *overruled in part on other grounds* by *State v. Leonard,* 300 N.C. 223, 230, 266 S.E.2d 631, 636, *cert. denied,* 449 U.S. 960, 101 S. Ct. 372, 66 L. Ed. 2d 227 (1980)).

"The diminished capacity defense to first-degree murder on the basis of premeditation and deliberation requires proof of an inability to form the specific intent to kill." *Id.* (citing *Cooper,* 286 N.C. at 572, 213 S.E.2d at 320). "Diminished mental capacity may be due to intoxication, disease, or some other cause." *Cooper,* 286 N.C. at 572, 213 S.E.2d at 320. The Supreme Court has held that:

> [W]hen a defendant requests the trial court to instruct the jury that it may consider the mental condition of the defendant in deciding whether [he or] she formed a premeditated and deliberate specific intent to kill the victim, . . . [t]he proper test is whether the evidence of defendant's mental condition is sufficient to cause a reasonable doubt in the mind of a rational trier of fact as to whether the defendant was capable of forming the specific intent to kill the victim at the time of the killing.

*State v. Clark,* 324 N.C. 146, 163, 377 S.E.2d 54, 64 (1989). The production of evidence that a defendant suffers from intoxication, substance abuse, emotional stress, or mental illness does not automatically entitle him or her to an instruction on diminished capacity, absent some evidence that these conditions impacted the defendant's ability to form the specific intent to kill. *Compare, e.g., State v. Staten,* 172 N.C. App. 673, 685-86, 616 S.E.2d 650, 658-59 (holding that the trial court did not err by denying the defendant's request for a diminished capacity instruction where, despite evidence that the defendant was mentally retarded, had been diagnosed with paranoid schizophrenia, and operated under a delusional belief system, there was no evidence that he did not have the specific intent to commit armed robbery), *disc. rev. denied,* 360 N.C. 180, 626 S.E.2d 838 (2005), *cert. denied,* 547 U.S. 1081, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), and *State v. Lancaster,* 137 N.C. App. 37, 44-45, 527 S.E.2d 61, 66-67 (holding that evidence of the defendant's drug addiction and testimony that drug use "could have had a negative impact" on his ability to plan did not entitle him to instruction on diminished capacity), *review allowed in part for the limited purpose of a remand to the Court of Appeals and denied in part,* 352 N.C. 680, 545 S.E.2d 723 (2000), *with State v. Golden,* 143 N.C. App. 426, 430-34, 546 S.E.2d 163, 166-68 (2001) (holding that the defendant was entitled to an

instruction on voluntary intoxication where an expert testified that the defendant's impairment would have affected his ability to form specific intent to commit offense), and *State v. Page*, 346 N.C. 689, 698, 488 S.E.2d 225, 231 (1997) (noting that the trial court instructed the jury concerning the issue of diminished capacity in connection with the issue of the defendant's guilt of first degree murder where the defendant adduced evidence that, at the time of the shooting, he was unaware of his surroundings or of the actual event), *cert. denied*, 522 U.S. 1056, 118 S. Ct. 710, 139 L. Ed. 2d 651 (1998). Thus, a review of the relevant decisions leads us to conclude that the crucial inquiry that must be undertaken in connection with a request for a diminished capacity instruction is not the extent to which the defendant has offered any evidence of mental impairment; instead, the crucial issue is whether there is any evidence tending to show the effect of his condition upon his ability to premeditate, deliberate, and form a specific intent to kill.

At trial, Defendant presented the testimony of two expert witnesses who discussed his mental and psychological status. Dr. Corvin, an expert in forensic psychiatry, interviewed Defendant and reviewed pertinent medical records. Dr. Corvin testified that Defendant had had a troubled childhood; had experienced traumatic events, including a head injury; and had a history of severe alcohol dependence. As Defendant correctly notes, "Dr. Corvin told the jurors [that Defendant] suffered from mental disorders including post [-]traumatic stress disorder [and the] after[-]effects of a concussion and alcohol dependence" and that other evidence showed that Defendant's blood alcohol level was elevated at the time of his arrest.

In his brief, Defendant asserts that "Dr. Corvin explicitly stated in his opinion [that Defendant] was not capable of rational thought at the time of the shooting." At trial, Defendant asked Dr. Corvin to describe for the jury "how [Defendant's] diagnosis of post-traumatic stress disorder and the other diagnoses or other conditions he was suffering from" would "interact with each other." In response, Dr. Corvin explained that, in general, a clinician would consider an individual's alcohol use, prior head injury, and post-traumatic stress syndrome in conjunction with each other and noted that this combination of conditions might make a person more susceptible to the effects of alcohol. Dr. Corvin then stated that:

> I think of it in terms of like how much water will the cup hold or, in clinical terms, how many risk factors and vulnerabilities does a client—does a patient—does [Defendant] have before his

capacity for reasonable and rational thought, conceptualization, judgment, and behaviors become absent.

Having adopted the overflowing cup analogy, however, Dr. Corvin did not express an opinion concerning whether Defendant's cup had overflowed or addressing the extent of Defendant's capacity for rational thought. In addition, Dr. Corvin stated in his report, which Defendant offered into evidence, that "it is possible that [Defendant] specifically and intentionally caused the death of Mr. Howell," although the excessive number of shots that Defendant fired caused Dr. Corvin to conclude that this possibility was unlikely. Taken in the light most favorable to Defendant, Dr. Corvin's testimony tended to establish that (1) Defendant's personal history, mental condition, and alcoholism made it more likely that he would react very strongly to Mr. Howell's decision to point a shotgun at him; (2) that, to counter the real or perceived threat posed by Mr. Howell's actions, Defendant initially fired several shots in self-defense; and (3) that, after firing the first few shots, which Dr. Corvin opined would have left Mr. Howell dead or incapacitated, Defendant entered into a dissociative state causing him to experience amnesia about the firing of the additional forty or so shots and his subsequent actions. Nothing in Dr. Corvin's testimony addressed, much less cast doubt on, Defendant's ability to premeditate, deliberate, or form the specific intent to kill Mr. Howell at the time of the firing of the fatal shots.

Similarly, although Dr. Coleman's testimony tended to show that Defendant suffered from post-traumatic stress syndrome, post-concussive syndrome, alcohol abuse, and some degree of cognitive impairment, she did not explain how these circumstances impaired Defendant's ability to premeditate, deliberate, or form a specific intent to kill. When asked directly what effect the combination of these conditions would have had on Defendant's response to Mr. Howell's decision to point a gun at him, Dr. Coleman testified that Defendant would have been very fearful and anxious. Although this evidence was clearly relevant to the sincerity of Defendant's belief that his life was in danger, it does not have any bearing on his ability to premeditate, deliberate, or form a intent to kill.

In seeking to persuade us that the trial court erred by declining to instruct the jury on the issue of diminished capacity, Defendant compares the present case to the facts before the Supreme Court in *State v. Shank*, 322 N.C. 243, 367 S.E.2d 639 (1988). In *Shank*, the issue was not whether the defendant was entitled to have the jury instructed on the defense of diminished capacity, but whether the trial court erred

by excluding evidence pertinent to such a defense. As a result, given that *Shank* did not address the sufficiency of evidence required to warrant such an instruction, it has little bearing on the proper resolution of this case.

At bottom, the fundamental problem with Defendant's argument is that it fails to distinguish between a defendant's ability or capacity to form the specific intent to kill—which is the focus of the defense of diminished capacity—and the wisdom or rationality of the decisions that a defendant actually makes. For example, self-defense is a complete defense to homicide precisely because it represents an exception to the fundamental principle that, when an individual chooses to kill another person, that choice, in addition to being unlawful, is almost always an irrational, unreasonable, and unnecessary response to the situation confronting the defendant that demonstrates the use of, at a minimum, extremely poor judgment. For that reason, evidence tending to show that, despite the fact that the defendant premeditated, deliberated, and formed a specific intent to kill, his decision to take the life of another resulted from an exceedingly unwise choice stemming from an irrational view of the situation in which he found himself does not establish that he could not form the requisite mental state necessary for guilt of first degree murder. As a result, we conclude that Defendant was not entitled to an instruction on diminished capacity based on the testimony of Dr. Corvin or Dr. Coleman and is not, given this conclusion, entitled to relief from his conviction on the basis of this claim.

## B. Officers' Testimony Regarding Observation of Hair

[2] Secondly, Defendant contends that he is entitled to a new trial on the grounds that the trial court committed prejudicial error by allowing law enforcement officers to testify that they had observed a small hair on the north wall of the Stocks' cabin and that the hair appeared to have tissue attached to it. In challenging the admission of this evidence, Defendant argues that the court "erroneously allowed the State to present a story resting on untested evidence unavailable to the Defendant." Defendant's argument lacks merit.

Prior to trial, Defendant filed a motion seeking to exclude any testimony or other evidence from Special Agent Eric Wall of the State Bureau of Investigation, Special Agent Van Williams of the State Bureau of Investigation, or Detective Nelson concerning their observation of a small hair with what appeared to be attached tissue on a wall in the Stocks' cabin. Defendant also objected at trial to this evi-

dence. On appeal, Defendant argues that, since the investigating officers did not photograph the hair or collect it as evidence, he was deprived of the opportunity to test the hair and defend against any implications that might be drawn from its presence on the wall. We conclude that the challenged evidence and testimony was not subject to exclusion on this basis.

At trial, three law enforcement officers testified that, while processing the scene of Mr. Howell's shooting, they observed a small hair on the north wall of the Stocks' cabin. A tiny bit of what appeared to be tissue was attached to this hair. After hearing the arguments of counsel, the trial court overruled Defendant's objection to the admission of this testimony and allowed the officers to testify concerning their personal observations relating to the hair in question.

N.C. Gen. Stat. § 8C-1 Rule 701 provides that:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

Defendant does not, in his brief, contend that any particular expertise is required for a witness to properly testify that he saw a hair. Similarly, we conclude that the officers were competent to testify that they observed a hair on the wall, since nothing about such an observation suggests the necessity for any particular degree of expertise in order to provide such testimony. Thus, unless there is some other reason for excluding the challenged evidence, the trial court did not err by admitting it.

Defendant cites *State v. Bass*, 303 N.C. 267, 272, 278 S.E.2d 209, 212 (1981), and *State v. General*, 91 N.C. App. 375, 379-80, 371 S.E.2d 784, 787 (1988), in support of his argument that the officers' testimony did not constitute substantial or conclusive evidence regarding the hair. However, both of the cases upon which Defendant relies address the question of whether the State presented sufficient evidence to support the submission of the case to the jury and not whether the testimony in question was admissible. As a result, these decisions do not control our decision in the present case.

In addition, Defendant relies upon cases, such as *State v. Jones*, 85 N.C. App. 56, 354 S.E.2d 251, *disc. review denied*, 320 N.C. 173, 358 S.E.2d 61, *cert. denied*, 484 U.S. 969, 108 S. Ct. 465, 98 L. Ed. 2d 404

(1987), which address the right of a criminal defendant to perform independent testing on physical evidence in the State's possession. However, such cases are not relevant to the present issue. Simply put, Defendant cites no authority for the proposition that the State is required to collect evidence as a pre-condition to offering testimony about a particular subject, and we have found no such authority in the course of our own research.

As a general proposition, "[t]he basis or circumstances behind a non-expert opinion affect only the weight of the evidence, not its admissibility." *State v. Edmondson*, 70 N.C. App. 426, 430, 320 S.E.2d 315, 318 (1983), *aff'd*, 316 N.C. 187, 340 S.E.2d 110 (1986). For the reasons set forth above, we conclude that Defendant's objections to the admission of this testimony went to its weight rather than its admissibility and that the trial court did not err by allowing the law enforcement officers to testify that they observed a hair and attached tissue on the wall of the Stocks' cabin.

## C. Agent Greene's Testimony Regarding Path of Bullet

[3] Finally, Defendant contends that he "is entitled to a new trial because the [trial] court erroneously allowed an SBI agent to testify to an opinion not based on scientifically acceptable methodology." At trial, Defendant challenged the admission of testimony and a related report by Special Agent Greene concerning his conclusion, based upon his review of a photograph of three holes in the north wall of the Stocks' cabin, that these holes were created by bullets and that the shape of one of these holes indicated that the bullet in question had struck an intermediate object before making contact with the wall. On appeal, Defendant argues that the trial court committed reversible error by allowing the admission of this evidence. We disagree.

As a preliminary matter, we must delineate the exact scope of Defendant's argument. At trial, evidence was received without objection tending to show that there were three bullet holes in the north wall of the Stocks' cabin. In addition, Special Agent Wall testified, without objection, that law enforcement officers used trajectory rods to locate the bullets that had passed through the wall in the master bedroom of the house and found them in an adjoining bedroom. Special Agent Greene, who was qualified as an expert in forensic firearms identification, testified, without objection, that forensic testing revealed that the bullets recovered from the bedroom had been fired from the revolver used to kill Mr. Howell. In addition, Special Agent Greene testified, without objection, concerning the effect that

making contact with an intermediate object might have upon a bullet's trajectory and upon the shape of the hole that such a bullet left in a wall. More specifically, Special Agent Greene was allowed to testify, without objection, that the presence of a "keyhole" shape in a wall might indicate that a bullet had struck an intermediate object before passing through the wall. As a result, Defendant's argument appears to rest solely on the grounds that Special Agent Greene used a photograph in developing his opinions.

N.C. Gen. Stat. § 8C-1, Rule 703, provides, in pertinent part, that "[t]he facts or data . . . upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing." Defendant cites no authority, and we know of none, holding that evidence that would otherwise suffice to form the basis for an expert opinion becomes insufficient if it takes the form of a photograph. For example, in *State v. Temple*, 302 N.C. 1, 10, 273 S.E.2d 273, 279 (1981), the Court allowed expert testimony from a forensic odontologist to the effect that a bite mark found on the victim had been made by the defendant. In *State v. Green*, 305 N.C. 463, 470-71, 290 S.E.2d 625, 630 (1982), the defendant sought to distinguish *Temple* on the grounds that "the expert formed his opinion on the basis of a comparison of defendant's dental impressions and a photograph of the victim's wound." The Supreme Court did not accept the defendant's contention "that this distinction precludes the admissibility of this testimony." Thus, the mere fact that an expert relied upon a photograph does not suffice to render an expert opinion inadmissible. As a result, the trial court did not err by admitting the challenged testimony.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that the Defendant received a fair trial that was free from prejudicial error. As a result, Defendant's conviction and the trial court's judgment should remain undisturbed.

NO ERROR.

Judges CALABRIA and THIGPEN concur.