An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-137

Filed 17 December 2025

Pitt County, No. 20CR055390-730

STATE OF NORTH CAROLINA

v.

KEVIN PAUL VEBBER, Defendant.

Appeal by defendant from judgment entered 1 November 2023 by Judge William D. Wolfe in Pitt County Superior Court. Heard in the Court of Appeals 14 October 2025.

*Stanley F. Hammer, for defendant-appellant.*

*Attorney General Jeff Jackson, by Special Deputy Attorney General Michael T. Wood, for the State.*

FLOOD, Judge.

Defendant Kevin Paul Vebber appeals from the trial court's judgment finding him guilty of first degree murder. On appeal, Defendant argues the trial court: first, erred by denying Defendant's request to instruct the jury on voluntary manslaughter and diminished capacity; second, plainly erred by failing to intervene *ex mero motu* during the State's cross examination of Defendant; and third, erred by overruling

Defendant's objections to video and photographic evidence of the killing. Upon careful review, we hold the trial court did not err in denying Defendant's requests for jury instructions on voluntary manslaughter and diminished capacity, did not plainly err in refraining from intervening *ex mero motu*, and did not err in overruling Defendant's objections to the State's presentation of video and photographic evidence of the killing.

## I. **Factual and Procedural Background**

This appeal arises from an incident that occurred on 20 September 2022, when Defendant shot and killed his ex-wife Charly Vebber. Defendant and Charly married in 2003, had a daughter in 2004, and later separated in July 2022. The following evidence was presented at trial regarding the days before and the day of the incident.

The couple's daughter, Tori, recalled that a day or two before Defendant killed Charly, she overheard Defendant talking "[v]ery angrily" on the phone with a friend about the couple's separation. She testified that she heard Defendant say he "was going to shoot mom and everything." Tori further testified that she believed Defendant had recently taken her phone when she was sleeping, pretended to be Tori, and, using Tori's phone, texted Charly criticisms about her decision to start dating other men. As Tori was testifying, she explained she did not send these messages; although they had been deleted from her phone, she had later found them on her iPad.

Defendant testified that on day of the shooting, he drove Tori to a friend's

birthday party. He further testified that during the party, "I racked the gun when I took my daughter to the birthday party and put it underneath the seat."

According to Tori, Defendant did not normally carry a gun, but he eventually left the handgun—a 9mm pistol—in the truck and joined the party. Once the party ended, Defendant drove Tori to Charly's house to drop her off. As they were driving to Charly's house, Defendant asked Tori if she would text Charly "to see if he could see his dog, Sugar, in the backyard." When they arrived at Charly's house, Tori walked inside, and Defendant walked around to the back of the house because he "wasn't allowed into the house." Defendant took the handgun with him, concealing it in his pocket. Charly and Tori came from inside the house out into the backyard, where "there's a deck that is just off th[e] back door." Defendant asked Tori to bring a case of soda from the truck into the house. After Tori left the backyard, Defendant and Charly stood on the deck talking.

Defendant testified that Charly "told me that I didn't need to be involved in Tori's life anymore." Defendant admitted that after Charly said this, "I was in fear of losing by daughter and I snapped," and "I grabbed Charl[y] and shot her." Defendant moved beside Charly, grabbed her around the neck, pulled the gun out of his pocket, and attempted to aim the gun at Charly's head. Charly pushed Defendant's gun away several times, but eventually Defendant shot Charly in the head. After she collapsed, Defendant stepped off the deck, walked around, and shot her in the head two more times. He then ran to his truck and fled.

Having witnessed the events, Tori testified that she had come back inside with the drinks where she "watched them struggle for a moment and then him shoot her. Go around and shoot her again through the railing of the deck." She then ran into a bathroom and called 911.

During Tori's testimony, the State, for the first time, played a portion of the security video surveillance from Charly's backyard storage shed—this video was admitted into evidence over Defendant's objection and showed the scene Tori described witnessing.

Charles Warters, Charly's father and neighbor, testified:

> I walked out my back door and looked over to the left towards Charl[y]'s house. When I actually looked at him he was grabbing my baby daughter and had a gun to her head. I hollered at him, What are you doing? He shot my youngin in the head. I saw her fall.
>
> . . . .
>
> When I hollered at [Defendant] and he shot. . . , he ran off the deck around and to the end. And he was looking at me. And I was looking at him. And he aimed the gun and shot.

Warters immediately went inside to get his gun and then went over to Charly's house, although Defendant had fled by the time Warters arrived. During Waters's testimony, the State played the rest of the security video, starting from where they ended during Tori's testimony through the time law enforcement arrived on the scene.

The State presented testimony from Lieutenant Justin Jones, who was the "on-call investigator for major crimes" and the lieutenant of firearms training and

standards the at the time of the shooting. During Lieutenant Jones' testimony, the State introduced three enlarged photograph stills from the video, which were admitted over Defendant's objections, showing where Defendant was: first, reaching around Charly and "racking the slide of the firearm"; second, standing beside the deck; and third, running towards the backyard building. Lieutenant Jones explained that Defendant, in the first photograph, was racking the gun, meaning "[g]rabbing the frame of the gun, grabbing the slide, pulling it to the rear[,]" which "either feeds the round from the magazine into the chamber or if [there is] already a round in the chamber it would extract and eject that round out." Lieutenant Jones then explained that by the third photograph, the Defendant's gun was "locked to the rear[,]" which means either there is a "malfunction" or "the magazine's empty[.]"

The State also introduced testimony by Robert Armstrong, who worked for the Pitt County Sheriff's office forensics unit at the time of the shooting. He explained how he located shell casings from the scene. During his testimony, the State—over Defendant's objection—again showed a portion of the video "related to the firearms with the shell casings coming out and where they we[re] located and where the gun was being fired at the time."

At trial, Defendant testified that he did not recall shooting Charly a second or third time and did not remember much about what happened afterward. He testified that after the shooting: "I know I talked to multiple people but I don't remember. I know I remember calling my aunt and I know I did talk to my uncle. I believe, I talked

to my father but I don't remember calling." Defendant further testified that Charly had been violating their separation agreement, including preventing him from seeing pictures and videos of Tori on Facebook. He explained that because of the co-parenting situation with Charly, he was "under a lot of stress"[,] "was losing sleep[,]" "wasn't eating regularly[,]" "[h]ad anxiety[,]" and "[h]ad blood pressure problems[.]"

On cross examination of Defendant, the State questioned why he did not tell the officers he did not remember anything:

> Q. When the sheriff's department got there[,] you didn't tell your mom or your brother what you did, did you?
>
> A. I don't remember really saying anything to my mom or my brother.
>
> Q. And when the sheriff's department got there to arrest you[,] you didn't say I blacked out. I don't know what happened. Why are you arresting me, did you?
>
> A. I don't recall much when they came, no.
>
> Q. Even after you got medical treatment you didn't go tell sheriff deputies. You didn't tell Lieutenant Jones that we heard from. I don't know what happened, did you?
>
> A. No, I didn't.
>
> Q. You didn't tell him you had some kind of mental problem or psychiatric problem and that you didn't remember or know the events of that evening, did you?
>
> A. No, I didn't.
>
> Q. You didn't actually tell or inform the State of that and that is by, what they call, reciprocal discovery where you give us what you've got. You didn't say that until after you

had all of the video and all of the pictures from us, did you?

> A. I've told my lawyer since I first start[ed] meeting with him what happened and what I remembered.

Defense counsel did not object to the State's line of questioning. The State further requested to show the video during its cross examination of Defendant, but the trial court denied its request.

Defendant's aunt, Nancy Rutledge, testified on behalf of Defendant, claiming that in the days before the shooting, Defendant was "[v]ery anxious[,]" and she "was concerned about him[,]" but that "[h]e told [her] he had a support system, that he was dating a nurse. That he had people he could talk to at work and that he was going to be okay."

Defendant's sister, Carrie Alston, testified that Defendant "never called out of work[,]" but he had to call out of work "twice in the last two weeks [prior to the shooting] just because he was having the migraines from just being so stressed out."

After the close of all evidence, the State again played the video for the jury, narrating the events.[1] The trial court then proceeded to the charging conference, and Defendant requested the trial court to include instructions on voluntary manslaughter and diminished capacity, which the trial court denied. During jury

---

[1] Although Defendant did not object at this point, the trial court had previously stated it was moving Defendant's objection made when the State requested to use the video during its cross examination of Defendant to this point, stating: "What I'm doing in response to a defense objection is altering the method and timing of that because the Court does intend to permit the State to use that videotape during closing argument."

deliberations, the jury informed the trial court it was struggling to reach a unanimous verdict and requested further instructions on the definition of premeditation. The trial court gave the jury an Allen charge,[2] and the jury again requested to view the video of the shooting, which the trial court allowed over Defendant's objection. The jury ultimately returned a guilty verdict of first degree murder; Defendant timely appealed.

## II. Jurisdiction

This Court has jurisdiction to review this appeal from a final judgment of a superior court, pursuant to N.C.G.S. §§ 7A-27(b)(1) and 15A-1444(a) (2023).

## III. Analysis

On appeal, Defendant argues the trial court (A) erred by denying Defendant's request to instruct the jury on voluntary manslaughter and diminished capacity, (B) plainly erred by failing to intervene *ex mero motu* during the State's cross examination of Defendant, and (C) erred by overruling Defendant's objections to video and photographic evidence of the killing. We address each argument, in turn.

### A. Jury Instructions

Defendant first argues the trial court erred by denying Defendant's request to instruct the jury on (1) voluntary manslaughter and (2) diminished capacity. We

---

[2] "The term 'Allen charge' is derived from the case of *Allen v. United States*, in which the United States Supreme Court approved the use of jury instructions that encouraged the jury to reach a verdict, if possible, after the jury requested additional instructions from the trial court." *State v. Gordon*, 278 N.C. App. 119, 122 (2021) (citation omitted).

disagree.

"[W]here the request for a specific instruction raises a question of law, 'the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court.'" *State v. Edwards*, 239 N.C. App. 391, 393 (2015) (quoting *State v. Osorio,* 196 N.C. App. 458, 466 (2009)). Under a de novo review, this Court "considers the matter anew and freely substitutes its own judgment for that of the lower court." *State v. Harris*, 276 N.C. App. 128, 131 (2021) (citation omitted). Where "a defendant requests an instruction which is supported by the evidence and is a correct statement of the law, the trial court must give the instruction, at least in substance." *State v. Garner,* 340 N.C. 573, 594 (1995) (citations omitted). "When determining whether the evidence is sufficient to entitle a defendant to jury instructions . . ., courts must consider the evidence in the light most favorable to the defendant." *State v. Mash,* 323 N.C. 339, 348 (1988) (citation modified).

### *1. Voluntary Manslaughter Jury Instruction*

Defendant first argues the trial court erred by denying Defendant's request to instruct the jury on voluntary manslaughter. Specifically, Defendant contends Charly's statement was adequate provocation such that there was evidence to instruct the jury on voluntary manslaughter. We disagree.

While first degree murder "is the unlawful killing—with malice, premeditation and deliberation—of another human being[,]" voluntary manslaughter "is the killing of another human being without malice and without premeditation and deliberation

under (1) the influence of some passion or (2) heat of blood produced by adequate provocation" and "is a lesser included offense of first[]degree murder." *State v. Simonovich*, 202 N.C. App. 49, 53 (2010) (citation modified). "In order to receive an instruction on voluntary manslaughter, there must be evidence tending to show a killing was committed in the heat of passion suddenly aroused by adequate provocation, or in the imperfect exercise of the right of self-defense." *State v. Vincent*, 195 N.C. App. 761, 765 (2009) (citation modified). "Provocation which will justify an instruction on manslaughter 'must be more than mere words; as language, however abusive, neither excuses nor mitigates the killing.'" *Simonovich*, 202 N.C. App. at 54 (quoting *State v. Watson*, 287 N.C. 147, 154 (1975)).

Defendant relies on *State v. Corn*, 303 N.C. 293, 297 (1981), for the proposition that words can constitute sudden provocation for the purposes of voluntary manslaughter. In *Corn*, the defendant was charged with first degree murder. *Id.* at 296. At trial, the defendant testified that he shot the victim in self-defense, and presented evidence that the defendant had been asleep at home when the intoxicated victim came to the defendant's home, "walked over to the couch on which [the] defendant was lying, grabbed [the] defendant, and began slinging him around and attempting to hit him." *Id.* at 295. "At some point during the altercation, [the victim] apparently accused [the] defendant of being a homosexual[,]" to which the defendant responded "you son-of-a-bitch, don't accuse me of that." *Id.* The defendant testified he then reached under the couch, grabbed the .22 rifle he normally kept there, "shot at

[the victim's] leg, and when [the victim] kept moving toward him, [the defendant] shot him several times in the chest." *Id.* The defendant then called the police and waited for them to arrive. *Id.* At the close of evidence, the defendant moved to dismiss the first degree murder charge for insufficient evidence, which the trial court denied, and the jury subsequently found the defendant guilty. *Id.* at 296.

On appeal to this Court, we held that the State failed to present substantial evidence that the defendant killed with premeditation and deliberation and thus remanded for a new trial. *Id.* at 298. We explained that "[t]he shooting was a sudden event, apparently brought on by some provocation on the part of the deceased[,]" and the uncontroverted evidence showed the victim "entered [the] defendant's home in a highly intoxicated state, approached the sofa on which defendant was lying, and insulted [the] defendant[,]" with the incident lasting "only a few moments." *Id.* at 297–98.

Here, unlike the defendant in *Corn*, who presented evidence of being "grabbed," "sl[ung]" around, called a homosexual, and of continuing to be approached even after shooting the victim in the leg, *see id.* at 295, Defendant presented no evidence of physical provocation; instead, Defendant argues he was adequately provoked by Charly's statement that he "didn't need to be involved in Tori's life anymore." As this Court has previously held, mere words, "however abusive, neither excuse[] nor mitigate[] the killing[.]" *Simonovich*, 202 N.C. App. at 54. Without more, even considering the evidence in the light most favorable to Defendant, *see Mash,* 323 N.C.

at 348, there was no evidence of adequate provocation to present jury instructions on voluntary manslaughter, *see Vincent*, 195 N.C. App. at 765. Accordingly, we affirm the trial court's denial of Defendant's request to instruct the jury on voluntary manslaughter.

## 2. Diminished Capacity Jury Instruction

Defendant next argues the trial court erred by denying his request for instruction on diminished capacity. Specifically, Defendant contends he presented sufficient evidence indicating he lacked the ability to form specific intent for first degree murder such that the trial court should have given an instruction on diminished capacity.

"A defendant is entitled to present evidence that a diminished mental capacity not amounting to legal insanity negated his ability to form the specific intent to kill required for a first[]degree murder conviction on the basis of premeditation and deliberation[.]" *State v. Page*, 346 N.C. 689, 698 (1997). "An instruction on diminished capacity is warranted where the evidence of the defendant's mental condition is sufficient to raise a reasonable doubt in the mind of a rational trier-of-fact as to whether the defendant had the ability to form the necessary specific intent[.]" *State v. Garcia*, 174 N.C. App. 498, 505 (2005). "The production of evidence that a defendant suffers from intoxication, substance abuse, emotional stress, or mental illness does not automatically entitle him or her to an instruction on diminished capacity, absent some evidence that these conditions impacted the defendant's ability to form the

specific intent to kill." *State v. McDowell*, 215 N.C. App. 184, 195 (2011). This Court

has explained:

> [T]he crucial inquiry that must be undertaken in connection with a request for a diminished capacity instruction is not the extent to which the defendant has offered any evidence of mental impairment; instead, the crucial issue is whether there is any evidence tending to show the effect of his condition upon his ability to premeditate, deliberate, and form a specific intent to kill.

*Id.* at 196.

Defendant relies on *State v. Shank* to support his argument that he presented

sufficient evidence to warrant a diminished capacity jury instruction. 322 N.C. 243

(1988). We have previously noted in a similar manner, however, "*Shank* did not

address the sufficiency of evidence required to warrant such an instruction," and as

such "it has little bearing on the proper resolution of this case." *McDowell*, 215 N.C.

App. at 198. Instead, we find *McDowell* instructive.

In *McDowell*, the defendant was convicted of first degree murder after he shot

his friend multiple times while they were staying in a cabin for a week. *Id.* at 193.

The trial court did not give a diminished capacity instruction. On appeal, the

defendant argued such instruction should have been given where there was evidence

that, at the time of the shooting, the defendant "suffered from various conditions,

including post-traumatic stress syndrome, alcohol dependence, and cognitive

impairment resulting from a head injury, that were sufficient to support a finding

that [the d]efendant might overreact to stress or conclude that deadly force was

necessary to deal with a threatening situation." *Id.* at 194.

At trial, the defendant had presented evidence from two expert witnesses as to his mental state, and while both expert witnesses' testimonies "tended to show that [the d]efendant suffered from post-traumatic stress syndrome, post-concussive syndrome, alcohol abuse, and some degree of cognitive impairment," they did "not explain how these circumstances impaired [the d]efendant's ability to premeditate, deliberate, or form a specific intent to kill." *Id.* at 197. On appeal, we explained that nothing in the witnesses' testimonies "addressed, much less cast doubt on," the defendant's "ability to premeditate, deliberate, or form the specific intent to kill" at the time of the shooting, even where one of the experts opined that after the initial shooting, the defendant "entered into a dissociative state causing him to experience amnesia about the firing of the additional forty or so shots and his subsequent actions." *Id.*

Here, Defendant did not present any expert witnesses as to his mental capacity. Defendant nonetheless argues his "testimony that he snapped[,]" coupled "with evidence demonstrating his frustration with his inability to co-parent with Charly or access family photographs[,]" was sufficient to permit a reasonable jury to conclude that he lacked the cool state [of] mind required to satisfy the specific intent element of first[]degree murder." He further argues he presented "evidence that he was 'stressed out' during the weeks prior to 20 September[,]" through the testimonies of his sister and aunt. Like the defendant's evidence in *McDowell*, however,

- 14 -

Defendant's evidence fails to address, "much less cast doubt on," his "ability to premeditate, deliberate, or form the specific intent to kill" at the time of the shooting. *See id.*

Thus, even viewing the evidence in the light most favorable to Defendant, *see Mash,* 323 N.C. at 348, Defendant has failed to present evidence to cast doubt on "his ability to premeditate, deliberate, and form a specific intent to kill[,]" *see McDowell,* 215 N.C. App. at 196. Accordingly, we affirm the trial court's denial of Defendant's request to instruct the jury on diminished capacity.

## B. The State's Cross Examination

Defendant next argues the trial court plainly erred by failing to intervene *ex mero motu* during the State's cross examination of Defendant. Specifically, Defendant contends the trial court should have intervened when the prosecutor "improperly impeached [D]efendant with his post-arrest silence in violation of the Fifth Amendment of the United States Constitution and Article I, § 23 of the North Carolina Constitution." We disagree.

Generally, "a constitutional question which is not raised and passed upon in the trial court will not ordinarily be considered on appeal[,]" *State v. Hunter,* 305 N.C. 106, 112 (1982), and thus, "[t]he failure to raise a constitutional issue before the trial court bars appellate review[,]" *State v. Valentine,* 357 N.C. 512, 525 (2003) (citation omitted). In criminal cases, however, unpreserved issues "may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and

distinctly contended to amount to plain error." N.C.R. App. P. 10(a)(4). Because Defendant failed to object to the prosecutor's cross examination, Defendant is only entitled to plain error review and may prevail only by showing "that a fundamental error occurred at trial." *See State v. Oliphant*, 228 N.C. App. 692, 696 (2013).

"To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *Id.* (citation omitted); *see State v. Lawrence*, 365 N.C. 506, 507 (2012) ("[T]he rule provides that a criminal defendant is entitled to a new trial if the defendant demonstrates that the jury *probably* would have returned a different verdict had the error not occurred." (alteration in original)). Moreover, "the plain error rule may not be applied on a cumulative basis, but rather a defendant must show that each individual error rises to the level of plain error." *State v. Dean*, 196 N.C. App. 180, 194 (2009).

Generally, a defendant may not be impeached by his post-arrest silence. *Doyle v. Ohio*, 426 U.S. 610, 618 (1976) ("[I]t would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.").

In his brief, Defendant "does not contend that absent the improper cross examination he would have been acquitted of all charges, but rather that it is 'almost certain' that absent the constitutionally improper cross examination, the jurors would have found that he did not act with premeditation or deliberation and a specific

intent" for first degree murder. Here, Defendant argues the State's cross examination regarding his post-arrest silence improperly impeached him.

Assuming *arguendo* that the trial court erred by not intervening *ex mero motu*, Defendant has not shown that "the jury probably would have returned a different verdict had the error not occurred." *Lawrence*, 365 N.C. at 507. Even if the jury could not consider Defendant's post-arrest silence, the jury heard Tori's testimony, including: she heard Defendant say he was "going to shoot mom"; Defendant did not normally carry a gun; on the day of the shooting, Defendant left the gun in the truck for a birthday party but brought the gun with him to Charly's backyard; and she watched her father shoot her mother, then walk around and shoot her again. The jury heard from Warters that he saw Defendant shoot Charly, and the jury also heard Defendant's own testimony that he left his gun in his truck during the birthday party but brought it with him to the backyard, and that he shot Charly, but could not remember much about what happened afterward.

After examining the Record, Defendant has not shown this error, if any, prejudiced him, where there was overwhelming evidence for the jury to conclude he acted with premeditation or deliberation and a specific intent. *See Oliphant*, 228 N.C. App. at 696. Accordingly, we conclude the trial court did not plainly err in failing to intervene *ex mero motu* during the State's cross examination of Defendant.

### C. Video and Photographic Evidence

Defendant lastly argues the trial court erred by overruling Defendant's

objections to (1) the photographic evidence of the killing and (2) the presentation of the video during trial and deliberations. We address each argument, in turn.

*1. Photographs*

Defendant first argues his constitutional right to a fair trial was violated when the trial court allowed the State to publish three photograph stills from the video shown. We disagree.

This Court reviews alleged violations of constitutional rights de novo. *State v. Graham*, 200 N.C. App. 204, 214 (2009). "Under a de novo review, th[is C]ourt considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Harris*, 242 N.C. App. 162, 164 (2015) (cleaned up). Generally, "[a] violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." *State v. Hooper*, 318 N.C. 680, 682 (1987) (citation omitted). "'Harmless beyond a reasonable doubt' has been interpreted to mean that there is no reasonable possibility" that the erroneous admission of evidence "might have contributed to the conviction." *Id.* at 682 (citation and internal quotation marks omitted). Where the evidence in question is "of such insignificant probative value when compared with the overwhelming competent evidence of guilt that its admission d[oes] not contribute to [the defendant's conviction[,]" then the "admission of the evidence was harmless . . . beyond a reasonable doubt." *Id.* at 682 (citation omitted). "The burden is upon the State to demonstrate, beyond a reasonable doubt, that the

error was harmless." N.C.G.S. § 15A-1443(b) (2023).

Our statutes provide that "[a]ll relevant evidence is admissible" at trial unless the Constitution of the United States, the Constitution of North Carolina, an act of Congress, an act of the General Assembly, or the Rules of Evidence say otherwise. N.C.R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.R. Evid. 401. A trial court may exclude relevant evidence, however, "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" N.C.R. Evid. 403. "A trial court's decision whether to admit or exclude evidence under Rule 403 is reviewed for abuse of discretion." *State v. Richardson*, 385 N.C. 101, 132–33 (2023) (citation omitted). "An abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 133 (citation and internal quotation marks omitted).

"Photographs are allowed to prove the character of the attack made by defendant upon the deceased, and to illustrate testimony regarding the manner of a killing in order to prove circumstantially the elements of murder in the first degree." *Id.* at 133 (internal citations and quotation marks omitted). "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury."

*State v. Hennis*, 323 N.C. 279, 284 (1988). "But when the use of photographs that have inflammatory potential is excessive or repetitious, the probative value of such evidence is eclipsed by its tendency to prejudice the jury[,]" *Richardson*, 385 N.C. at 133 (citation and internal quotation marks omitted), and "the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors[,]" *Hennis*, 323 N.C. at 284 (citation omitted). "The number of photographs alone is an insufficient measure of their capacity to prejudice and inflame the jury; instead, the court looks to their probative value and the circumstances of their introduction into evidence." *State v. Phipps*, 331 N.C. 427, 454 (1992). Our Supreme Court has explained,

> [t]he test for excess is not formulaic: there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great. Ultimately, whether the use of photographic evidence is more probative than prejudicial and what constitutes an excessive number of photographs in the light of the illustrative value of each likewise lies within the discretion of the trial court.

*Richardson*, 385 N.C. at 133 (citation modified).

Defendant points us to the North Carolina Supreme Court's decision in *Hennis*. 323 N.C. at 284. In *Hennis*, the defendant was charged with first degree murder of three victims, and at trial, the State published twenty-six photographs of the victims' autopsies. The Court held this was prejudicial, explaining,

> the majority of the twenty-six photographs taken at the

> victims' autopsies here added nothing to the [S]tate's case
> as already delineated in the crime scene slides and their
> accompanying testimony. Given this absence of additional
> probative value, these photographs—grotesque and
> macabre in and of themselves—had potential only for
> inflaming the jurors.

*Id.* at 286.

Defendant argues that, like the autopsy photos in *Hennis*, the State's Exhibits 102–104, which were poster-board-sized stills from the video, were inflammatory. These three enlarged photographs, however, were used to illustrate Lieutenant Jones's testimony, showing how Defendant racked and fired the gun in the backyard when he shot Charly. The State had the burden to prove that Defendant acted with premeditation or deliberation and a specific intent to kill Charly, such that illustrating testimony by an officer on how Defendant racked and fired the gun was relevant and probative. Thus, we conclude the trial court did not abuse its discretion in allowing these three photographs to be used as illustrating testimony where the photographs were not used only for inflaming the jurors. *See Richardson*, 385 N.C. at 133; *Hennis*, 323 N.C. at 286.

### 2. Videotape

Defendant next contends his constitutional right to a fair trial was violated when the trial court allowed the jury to view the video multiple times. Specifically, Defendant argues "[t]he excessive use of the videotape at trial and its unnecessary playback during deliberations effectively encouraged the jury to concentrate its focus

on a few damning seconds of a video to the exclusion of a wealth of evidence" of Defendant's "depressed state of mind" and his fear of losing his daughter. We disagree.

"The basic principles which govern the admissibility of photographs apply to videotapes[.]" *State v. Kandies*, 342 N.C. 419, 444 (1996). Thus, videos "may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284. Additionally, N.C.G.S. § 15A-1233(a) provides:

> If the jury after retiring for deliberation requests a review of certain testimony or other evidence, the jurors must be conducted to the courtroom. The judge in his discretion, after notice to the prosecutor and defendant, may direct that requested parts of the testimony be read to the jury and may permit the jury to reexamine in open court the requested materials admitted into evidence.

N.C.G.S. § 15A-1233(a) (2023).

Here, the video was played three times during trial: once, divided into two portions, during Tori's and Warters's testimonies; once during Officer Armstrong's testimony; and once during the State's closing argument. The jury then viewed the video once more after it requested to see it during jury deliberations.

The first time the video was played, it was used to illustrate Tori's and Warter's testimonies as to what they witnessed, and then the second time it was played, the video was used to illustrate Officer Armstrong's testimony as to when the gun was

fired and where he located the shell casings. Because these two showings were used "for illustrative purposes" and were not "aimed solely at arousing the passions of the jury[,]" we conclude the trial court did not err allowing the video to be shown in those instances. *Hennis*, 323 N.C. at 284.

As for the other two viewings—during the State's closing argument and jury deliberations—even assuming it was error for the trial court to allow the video to be played again, the State has produced "overwhelming competent evidence of guilt." *Hooper*, 318 N.C. at 682. The jury heard Tori's testimony that Defendant said he was "going to shoot mom"; Defendant did not normally carry a gun, yet on the day of the shooting, Defendant brought a gun, left it in the truck for the birthday party, but brought it with him to Charly's backyard; and she watched her father shoot her mother, then walk around and shoot her again. The jury also heard Defendant's own testimony that he left his gun in his truck during the birthday party but brought it with him to the backyard, and that he shot Charly. Thus, the admission of the video did not contribute to Defendant's conviction and was harmless beyond a reasonable doubt. *Id.* at 682.

Accordingly, we conclude the trial court did not err in allowing the jury to view the three photographs during trial and the jury to watch the videotape.

## IV. <u>Conclusion</u>

Upon careful review, we conclude the trial court did not err in denying Defendant's requests for jury instructions on voluntary manslaughter and

diminished capacity, did not plainly err in refraining from intervening *ex mero motu*, and did not err in overruling Defendant's objections to the State's presentation of video and photographic evidence of the killing.


NO ERROR.

Chief Judge DILLON and Judge GRIFFIN concur.

Report per Rule 30(e).